**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NINA CHILDRESS,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO.:** |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN COLVIN,** | : | **2:13-CV-1959-CDJ** |
| | : | |
| **Defendant.** | : | |

<u>**MEMORANDUM**</u>

Judge C. Darnell Jones, II                                February 28th 2014

      Pending before the court is a Motion to Dismiss or, Alternatively, for Summary Judgment, (Doc. No. 14), filed by defendant Social Security Administration seeking dismissal of Count I (disparate treatment and hostile work environment) and Count II (retaliation) of the amended complaint, (Doc. No. 13). As discussed in more detail below, the court will **CONSTRUE** the motion as a Rule 12(b)(6) motion to dismiss. After a thorough review of the parties' filings, the court will **DENY** the motion in its **ENTIRETY**.

<u>**BACKGROUND**</u>

      This dispute can be traced back to August 2001, when the Social Security Administration first hired plaintiff as a computer specialist and web developer. (Compl. at 2.) Plaintiff avers that she was the only African-American employee on her assigned team at the time she was hired and throughout the term of her employment with defendant. (*Id.* at 3.) Mr. Art Ford was plaintiff's first team leader, and Ms. Elizabeth Smith was assigned to her as a mentor. (*Id.*) As a team leader, Mr. Ford was

authorized to discipline and conduct employee evaluations. (*Id.*) The complaint does not indicate what authority mentors had over their mentees.

Plaintiff excelled at her new job. She received a number of awards for her work product, including a Commissioner's Group Award in October 2002, an Individual Award in 2004, an Individual Performance Award in May 2005, and a Group Award in May 2005. (*Id.*) As a result of her success, plaintiff was selected to participate in the Regional Management Development Program, a course developed to "identify potential management candidates and develop them for advancement in the SSA." (*Id.*) Plaintiff accepted the opportunity and participated in fourteen months of training, after which she returned to her job in October 2006 and received a "satisfactory job performance review" in March 2007. (*Id.* at 4.)

Despite her success, Mr. Ford "placed [her] on a performance improvement plan without notice or warning" just six weeks after her satisfactory March review, ostensibly because she was unable to complete a project. (*Id.*) Plaintiff admits that she had trouble finishing one project but explains that she was never given proper training for the assignment as her Caucasian coworkers were. (*Id.*) She avers that Sandy Erickson, a Caucasian team member, also failed to complete the project but that Mr. Ford did not place her on a performance improvement plan. (*Id.*) Plaintiff explains that she overheard Ms. Klein "providing false and derogatory information to Mr. Ford about Plaintiff," which she claims Mr. Ford relied on in his decision to place her on the performance improvement plan. (*Id.*) As a result, plaintiff complained to the Social Security Administration's Equal Employment Officer in August 2007. (*Id.*) She participated in alternative dispute resolution in September 2007 and filed a

formal complaint on October 1, 2007. (*Id.*) The matter was later settled, although the court is not privy to the terms and conditions of that agreement. (*Id.*)

Immediately following settlement, Mr. Ford resigned from his position as team leader and was replaced by Ms. Klein. (*Id.* at 4-5.) Plaintiff alleges that Ms. Klein "began an intense campaign intending to evict Plaintiff from her position." (*Id.* at 5.) For example, plaintiff alleges that she was given difficult work assignments with arduous deadlines but that Caucasian employees were not:

a.   In July, 2010, Ms. Klein assigned Plaintiff a task called TSRP Scheduler shortly before a Departmental Meeting, knowing Plaintiff was leaving for a prepaid vacation two days later which Ms. Klein herself approved. Ms. Klein then threatened Plaintiff that her planned absence for vacation would be unexcused if the project was not completed within those two days;

b.   In August, 2010, Ms. Klein assigned Plaintiff a task called "Client Mismatch." Although [she] had completed the project up to her original specifications by the requested deadline, Ms. Klein suddenly, and without warning, advised that the work was incorrect and needed to be redone. By not noticing Plaintiff of these flaws earlier, Ms. Klein caused Plaintiff to miss a deadline for this project and then rebuked her for missing the deadline;

c.   In September, 2010, Ms. Klein assigned a troubleshooting project to [Plaintiff] with a program called "Leave Roster." Leave Roster was programmed by another worker who had left the agency, and was a very complex program. Ms. Klein knew that there were two Caucasian employees with experience with this program, but instead assigned this task to Plaintiff . . .

d.   From September, 2010, through December, 2010, Plaintiff was asked to participate in one hour meetings where Ms. Klein would scrutinize Plaintiff's work while Ms. Klein's supervisor took notes. No other employees were subjected to similar meetings or treatment. Plaintiff repeatedly asked why she was required to have these meetings, but was not provided a response by either Ms. Klein or anyone else with SSA;

e.   Throughout 2011, Plaintiff was working on a significant project called "Pending Claim." After Plaintiff spent numerous days and

> weeks on this project, without notice or warning, Ms. Klein added a
> long list of items that needed to be added to this project without
> providing any extension to [the] deadline. Ms. Klein further refused
> to allow any other programmer to assist Plaintiff in these changes.

(*Id.* at 5-6.)

Plaintiff also alleges that Ms. Klein denied plaintiff the best and most visible
work projects, instead giving them to Caucasian employees who produced poor
results because they lacked the necessary skills for the job. (*Id.* at 6.) In particular,
plaintiff alleges:

> b.    On June 21, 2010, Plaintiff asked Ms. Klein, via email, for
>       additional assignments. Ms. Klein did not provide Plaintiff any
>       new assignments until July 15, 2010. Upon information and
>       belief, Ms. Klein provided other Caucasian employees multiple
>       assignments during this same time period.

(*Id.*)

Despite Ms. Klein's treatment, Ms. Christine Regis and Ms. Mary Horne, who
supervised Ms. Klein and were both aware of Ms. Klein's treatment of plaintiff, did
nothing to remedy the situation. In response, plaintiff filed another EEO complaint in
February 2011, which was thoroughly investigated by the EEOC. (*Id.* at 6-7.)

Nonetheless, Ms. Klein continued to treat plaintiff poorly, reprimanding her for
minor issues while Caucasian employees received no such treatment. (*Id.* at 7.)
Plaintiff states:

> a.    On March 31, 2011, Plaintiff overheard Ms. Klein inform Gary
>       Paterson that Plaintiff "is not going to do any work." Ms. Klein's
>       defamatory statement shocked Mr. Paterson and no similar
>       comments were made about any Caucasian employee on
>       Plaintiff's team;
>
> b.    On May 19, 2011, Ms. Klein rebuked Plaintiff in front of a co-
>       worker named Judy Krumm. After Ms. Klein left, Ms. Krumm told

4

Plaintiff "I don't know what it is but Ms. Klein is nice to everyone but it is clear she hates you!";

c.   On October 25, 2011, Ms. DeRegis rebuked Plaintiff for preparing materials for the SSA investigation while off the clock. Ms. DeRegis also pressured Plaintiff to inform her when she was working on materials for her Complaint, regardless of whether Plaintiff was off-duty. Ms. DeRegis also pressured Plaintiff to inform her when she was working on materials for her Complaint, regardless of whether Plaintiff was off-duty. Ms. DeRegis further scrutinized when Plaintiff took her work breaks and lunch breaks and would often question her about her activities during such breaks. These activities were directed to chill Plaintiff from engaging in further protected activity;[1]

d.   On November 1, 2011, Ms. DeRegis and Ms. Klein disciplined Plaintiff for being late coming back from a break a day or two before. Mr. Ford, who is Caucasian, was frequently late coming back from break and went on excessive coffee runs with other Caucasian employees. Yet, Mr. Ford was never disciplined for the same infraction Plaintiff was;

e.   On or about November 1, 2011, Plaintiff apologized to both Ms. DeRegis and Ms. Klein for missing a meeting. Ms DeRegis advised Plaintiff not to worry about it, and nothing was missed because they were just giving out awards. The next day, however, Ms. Klein called [Plaintiff] into her office and rebuked [her] for missing the meeting. The day after that, Ms. DeRegis reversed course without notice or reason and directed [Plaintiff] to take leave;

f.   On March 13, 2012, Ms. Klein and/or Ms. DeRegis verbally attacked Plaintiff after she had the nerve to resolve a problem without their (mis)direction;

g.   On April 13, 2012, Ms. DeRegis demanded to know where Plaintiff was while on "flex leave," wanting to know where Plaintiff was and what she was working on while on break. Ms. DeRegis did not make the same inquiry [of] Caucasian employees or those who had not filed an EEO Complaint against the SSA;

_____

[1] The court notes that plaintiff's allegation as to Ms. DeRegis's motive is a conclusion of law and not entitled to a presumption of truth.

      h.      On April 17, 2012, Plaintiff received an email from Ms. DeRegis again pressuring her to advise when she [was] working on her 2011 Complaint. This activity was intended to chill Plaintiff from engaging in protected activity, including working on her EEO Complaint;[2]

      i.      On April 20, 2012, Ms. DeRegis again pressured Plaintiff by asking for information pertaining to Plaintiff's preparation for the 2011 Complaint. Plaintiff responded that this activity always occurred while she was off the clock. Nevertheless, Ms. DeRegis persisted in asking questions about what Plaintiff was doing, intending to intimidate Plaintiff into settling or dropping her 2011 Complaint.[3]

(*Id.* at 7-8.)

When this treatment persisted, plaintiff made several requests for a transfer to another position or team, but her requests were denied, allegedly without explanation, even though she was qualified for the positions. (*Id.* at 9.) Plaintiff avers that Caucasian employees and those who had not filed EEO complaints submitted similar requests and were granted transfers during the same time period that plaintiff applied for open positions. (*Id.*)

Finally, plaintiff alleges that she was denied Claims Representative core training, which was nonetheless offered to at least six Caucasian employees. (*Id.* at 9-10.) All of the foregoing culminated in a poor and allegedly vague performance evaluation on March 16, 2012. (*Id.* at 10.) Shortly thereafter, in April 2012, Ms. Klein, Ms. DeRegis and Ms. Horne drafted a Proposal to Remove, a document that appears to have begun the formal termination process. (*Id.*) In May 2012, the SSA acted on the proposal and terminated plaintiff's employment with the agency. (*Id.*)

---

[2] As noted in footnote one, *supra* at 5, this allegation is a conclusion of law.
[3] Ms. DeRegis's purported rationale is a conclusion of law and is not entitled to a presumption of truth.

Plaintiff filed the present action with this court on April 12, 2013, and defendant subsequently moved to dismiss the complaint. (Doc. No. 11.) Plaintiff filed an amended complaint on August 21, 2013, (Doc. No. 13), thereby mooting defendant's earlier motion, and defendant filed the motion to dismiss presently pending before the court. The parties completed briefing on September 23, 2013, so the matter is ripe for disposition. (Doc. No. 14 (Motion); Doc. No. 15 (Response)).

## STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation and citation omitted). After the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This standard, which applies to all civil cases, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678; *accord Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) ("All civil complaints must contain more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal quotation omitted).

## DISCUSSION

As an initial matter, the court will construe defendant's motion as a motion to dismiss, not a motion for summary judgment, because the parties have yet to exchange discovery. *Boandi v. Geithner*, 752 F.Supp.2d 540, 555 (E.D.Pa. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("*Celotex* sets forth the basic presumption that summary judgment is only appropriate 'after adequate time for discovery.'"). Furthermore, because the court will treat the motion as a motion to dismiss, the McDonnell Douglas burden-shifting scheme has no relevance at this stage of litigation. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) ("The prima facie case under *McDonnell Douglas*, however, is an evidentiary standard, not a pleading standard.") In light of these findings, the court will now address defendant's motion to dismiss.

**A. Count I: Race-Based Discrimination and Hostile Work Environment**

Defendant seeks dismissal of Count I, particularly plaintiff's discrimination claim, on the grounds that plaintiff has failed to plead facts raising a plausible inference that defendant's adverse employment actions were motivated by race. (Motion, at 15-18.) To properly state a claim for racial discrimination under Title VII, a plaintiff must establish that "(1) she is a member of a protected class; (2) she was qualified for the position she held or sought; (3) she suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably, or that the circumstances of her termination give rise to an inference of discrimination." *Clinkscales v. Children's Hosp. of Philadelphia*, 06-CV-3919, 2007 WL 3355604, *4 (E.D.Pa. Nov. 9, 2007) (quoting *Taylor v. Brandywine Sch. Dist.*, 202 F. App'x 570, 575 (3d Cir. 2007)). Plaintiff's burden at this stage can be

satisfied by alleging that similarly situated employees of a "nonprotected class" were treated more favorably than she was. *Kerns v. Drexel University*, 06-CV-5575, 2008 WL 2876590, *14 (E.D.Pa. July 24, 2008).

Here, plaintiff alleges:

10.   When hired, and throughout the term of Plaintiff's employment, she was the only African-American on her assigned team.

11.   Early in her employment, Plaintiff was assigned Elizabeth Klein as a mentor. . . . Ms. Klein would gossip about Plaintiff behind her back, refuse to assist her in projects and falsely derided Plaintiff's work product to other team members and superiors. Ms. Klein did not treat other Caucasian team members in the same manner.

16.   Six weeks after [a] positive March 2007 review, however, Mr. Ford placed Plaintiff on a performance improvement plan without notice or warning.  Mr. Ford informed Plaintiff she was placed on this plan because of her inability to complete a project. Plaintiff believed this to be a pretextual lie for racial discrimination where, among other reasons, (1) she was never afforded the training necessary to complete the project, which was offered to similarly-situated Caucasian employees; (2) Sandy Erickson, a Caucasian team member, also failed to complete the project but was not placed on a performance improvement plan . . .

21.   Ms. Klein also denied Plaintiff highly visible work projects that may enable her to receive awards, promotions and other forms of recognition. These projects were frequently given to similarly-situated Caucasian employees who either lacked the skills to complete such work or produced a substandard work product . . .

b.   On June 21, 2010, Plaintiff asked Ms. Klein, via email, for additional assignments. Ms. Klein did not provide Plaintiff any new assignments until July 15, 2010. Upon information and belief, Ms. Klein provided other Caucasian employees multiple assignments during this same time period.

26.   Mr. Klein would reprimand Plaintiff for minor performance issues while Caucasian employees were not reprimanded or

counseled. Some of these incidents included, but are not limited to[:]

    a.    On March 31, 2011, Plaintiff overheard Ms. Klein inform Gary Paterson that Plaintiff "is not going to do any work." Ms. Klein's defamatory statement shocked Mr. Paterson and no similar comments were made about any Caucasian employee on Plaintiff's team . . .

    d.    On November 1, 2011, Ms. DeRegis and Ms. Klein disciplined Plaintiff for being late coming back from a break a day or two before. Mr. Ford, who is Caucasian, was frequently late coming back from break and went on excessive coffee runs with other Caucasian employees. Yet, Mr. Ford was never disciplined for the same infraction Plaintiff was . . .

    g.    On April 13, 2012, Ms. DeRegis demanded to know where Plaintiff was while on "flex leave," wanting to know where Plaintiff was and what she was working on while on break. Ms. DeRegis did not make the same inquiry to Caucasian employees . . .

28.    Because of [the] toxic environment created or allowed by Ms. Klein, Ms. Regis and/or Ms. Horne, Plaintiff repeatedly requested a transfer to another position or team. . . . All of Plaintiff's requests were either ignored or summarily denied for unstated reasons. During the time Plaintiff requested a transfer, numerous Caucasian employees . . . were transferred to open positions and different teams. Plaintiff often applied for these positions and, despite being qualified, was rarely interviewed and never awarded the positions.

29.    Plaintiff was also denied training opportunities offered to other Caucasian employees . . . . Specifically, Plaintiff was never offered Claims Representative ("CR") Core training[,] which was offered Steve Tyska, Gary Caluderay, Mike Piownoski, Bridget Newman, Imran and Bill Myers, all Caucasian employees hired subsequent to Plaintiff.

In sum, plaintiff makes numerous allegations indicating that she was treated less favorably than similarly situated Caucasian employees. This alleged conduct occurred from March 2007 to April 2012, and, contrary to defendant's argument, it

raises a plausible inference of a pattern of discrimination spanning more than five years. As such, defendant's motion to dismiss Count I on the basis that plaintiff failed to adequately plead discriminatory motive will be **DENIED**.

Next defendant seeks dismissal of plaintiff's hostile work environment claim under Count I on the grounds that plaintiff has failed to properly allege a discriminatory motive and severe or pervasive harassment. (Motion, at 18-21.) To properly plead a claim for hostile work environment under Rule 8 of the Federal Rules of Civil Procedure, a plaintiff must allege "(1) that she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person in the same position; and (5) the existence of *respondeat superior* liability." *Clinkscales v. Children's Hosp. of Philadelphia*, 06-CV-3919, 2007 WL 3355604, *5 (E.D.Pa. Nov. 9, 2007) (citing *West v. Phila. Elec. Co.*, 45 F.3d 744, 753 (3d Cir. 1995) (abrogated on other grounds). The Third Circuit has stated that the conduct complained of must be both subjectively and objectively hostile. *Brooks v. CBS Radio, Inc.*, 342 F.App'x 771, 776 (3d Cir. 2009) ("Further, it is not sufficient for [plaintiff] to have subjectively perceived the harassment as severe or pervasive; the conduct in question must also be so severe or pervasive that it creates an objectively hostile work environment.") The objectiveness requirement ensures that the sensitivities of an individual plaintiff do not subjectively define the federal standard for discrimination.  Furthermore, the Supreme Court has warned that Title VII "does not set forth a general civility code for the American workplace." *Burlington Northern and Sante Fe Ry. Co. v. White*, 548 U.S.

53, 68 (2006). Rather Title VII "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Therefore, courts must consider the totality of the circumstances and analyze "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hightower v. Easton Area School Dist.*, 818 F.Supp.2d 860, 877 (E.D.Pa. 2011).

As noted above, plaintiff has adequately pleaded a discriminatory motive. The remaining question, however, is whether the harassment was severe or pervasive on both an objective and a subjective level. A review of the complaint answers that question in the affirmative. Plaintiff alleges that similarly situated Caucasian employees were given more favorable assignments than plaintiff, that Ms. Klein would gossip about plaintiff and deride her work product to other employees, that she was treated more harshly than Caucasian employees when she did not perform well or returned from break late, that her superiors withheld work from her and gave it to Caucasian employees, and that she was denied transfer requests that were granted for other employees, all of whom were Caucasian. These allegations hardly amount to "isolated or single incidents of harassment," and other courts in this district have found similar conduct to be pervasive and regular harassment. *Clinkscales v. Children's Hosp. of Philadelphia*, 06-CV-3919, 2007 WL 3355604, *5 (E.D.Pa. Nov. 9, 2007) (finding factually synonymous circumstances to be pervasive

and regular).[4] Furthermore, the court believes that the harassment described above would undoubtedly have a detrimental effect on a reasonable person. As such, defendant's motion to dismiss Count I will be **DENIED**.

## B. Count II: Retaliation for Protected Activity

Defendant moves to dismiss Count II of the complaint, plaintiff's retaliation claim, on the ground that plaintiff "has not sufficiently alleged a causal connection between her prior EEO activity and her removal for unsatisfactory performance." (Motion, at 25.) Title VII states in relevant part:

> (a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings
>
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

---

[4] The Clinkscales court said:

> However, Plaintiff alleges more than isolated incidents in support of her claim. She claims, *inter alia*, that despite written confirmation of her job duties, those duties were reassigned to white employees, *see* Second Am. Compl. ¶¶ 42, 50, 96; that she was held to higher standards of conduct than white employees, *see id.* ¶¶ 78, 84; that she was humiliated by Schwinghammer in emails copied to a fellow employee, *see id.* ¶ 86; that Schwinghammer monitored her phone calls and e-mails but did not monitor the communications of white employees, *see id.* ¶¶ 82-83; that Schwinghammer disciplined her in writing for complaining about the hostile work environment, *see id.* ¶ 173; that a white employee was given preferential treatment when that employee took medical leave, *see id.* ¶¶ 178-80; and that CHOP and human resources officials were aware of the alleged hostile work environment but failed to remedy the problem, *see id.* ¶¶170, 205. The Court finds that Plaintiff has sufficiently put Defendants on notice of the basis for her hostile work environment claim against CHOP, thus satisfying Rule 8 standards.

42 U.S.C. §2000e-3(a).

The Supreme Court has interpreted the anti-retaliation provision of Title VII to require but-for causation under 42 U.S.C. §2000e-3, meaning that the protected activity must be the but-for cause of the adverse employment action. *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2528 (2013). In adopting this standard, the Court expressly rejected the less demanding motivating factor test, fearing the proliferation of frivolous retaliation claims. *Id.*

When analyzing but-for causation in retaliation claims, courts frequently look at the temporal gap between the protected activity and the adverse employment action. *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (looking at time to see if it is unusually suggestive of motive); *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (same). Here, the complaint alleges, "[p]laintiff complained to the SSA's Equal Employment Officer in August 2007, participated in the SSA's alternative dispute resolution process in September 2007 and filed a formal complaint on October 1, 2007." (Compl. at 4.) Furthermore, plaintiff filed a formal EEO complaint against the SSA on February 15, 2011, and December 2, 2012. These actions undoubtedly constitute protected activity. *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 287-88 (3d Cir. 2001) (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)) (explaining that "acceptable forms of protected activity . . . include formal charges of discrimination 'as well as informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-

14

workers who have filed formal charges.'"); *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (explaining that retaliation provision covers participation in Title VII proceedings and official investigations as well as opposition to certain practices); *Andreoli*, 482 F.3d at 650 (informal complaint as protected activity); *Payne v. Heckler*, 604 F.Supp. 334, 341 (E.D.Pa. 1985) (preparing administrative complaint is protected activity). Furthermore, the allegations create a plausible inference of a pattern of discriminatory conduct stretching from May 2007[5] to March 2012.[6] This pattern of

---

[5] The first allegation of misconduct states:

> Six weeks after this positive March 2007 review, however, Mr. Ford placed Plaintiff on a performance improvement plan without notice or warning. Mr. Ford informed Plaintiff she was placed on this plan because of her inability to complete a project. Plaintiff believed this to be a pretextual lie for racial discrimination where, among other reasons, (1) she was never afforded the training necessary to complete the project, which was afforded to similarly-situated Caucasian employees; (2) Sandy Erickson, a Caucasian team member, also failed to complete the project but was not placed on a performance improvement plan; and (3) Plaintiff overheard Ms. Klein providing false and derogatory information to Ms. Ford about Plaintiff, which he relied upon when making this recommendation.

(Compl. at 4.)

This misconduct allegedly occurred six weeks after the March 2007 review, which means it must have occurred, at the latest, in May 2007.

[6] Several allegations raise a plausible inference that Ms. Klein and Ms. DeRegis engaged in discriminatory conduct as late as March and April 2012. These include:

> On April 13, 2012, Ms. DeRegis demanded to know where Plaintiff was while on "flex leave," wanting to know where Plaintiff was and what she was working on while on break. Ms. DeRegis did not make the same inquiry to . . . those who had not filed an EEO Complaint against the SSA[.]

> On April 17, 2012, Plaintiff received an email from Ms. DeRegis again pressuring her to advise when she is working on her 2011 Complaint.

alleged misconduct occurred both during and after plaintiff engaged in protected activity. For instance, a month after she filed her February 15th complaint, plaintiff alleges that Ms. Klein made false statements to Gary Paterson about plaintiff's work ethic. (Compl. at 7.) Furthermore, the complaint indicates that, on at least one occasion, Ms. DeRegis reprimanded plaintiff for preparing "materials for the SSA investigation while off the clock." (Compl. at 7.) Later, in April 20, 2012, Ms. DeRegis allegedly began asking plaintiff for information concerning when she was preparing her 2011 complaint. (Compl. at 8.) She informed plaintiff that plaintiff must inform her whenever she was working on her complaint, even if plaintiff was off-duty. (Compl. at 7.) The temporal gaps between protected activity and these employees' actions certainly raises a plausible inference of retaliation, especially when viewed against the backdrop of Ms. DeRegis's surveillance of plaintiff's EEO preparation. Furthermore, these allegations culminate in Ms. Klein's denial of plaintiff's transfer requests and ultimately plaintiff's termination in 2012. (Compl. at 7-8.) The court believes that the complaint is sufficient to place defendant on notice of the substance of her claims and plaintiff's allegations detailed enough to raise a plausible inference

---

On April 20, 2012, Ms. DeRegis again pressured Plaintiff by asking for information pertaining to Plaintiff's preparation for the 2011 Complaint. Plaintiff responded that this activity always occurred while she was off the clock. Nevertheless, Ms. DeRegis persisted in asking questions about what plaintiff was doing[.]

In March, 2012, Plaintiff asked Ms. DeRegis to be transferred to another position or team. Ms. DeRegis responded that there was "nowhere Plaintiff could go" and "there is no place for you within the SSA."

(Compl., at 8-9.)

that defendant engaged in unlawful conduct. As such, defendant's motion to dismiss Count II of the complaint will be **DENIED**.

**D. Vicarious Liability**

Defendant next argues that, even if Ms. Klein did engage in conduct that violated Title VII, she was not a supervisor as defined by *Vance v. Ball State University* and therefore the Social Security Administration cannot be held vicariously liable for Ms. Klein's conduct. 133 S.Ct. 2434 (2013). In *Vance*, the Supreme Court addressed the issue of vicarious liability under Title VII and drew a line between discriminatory conduct by a supervisor and similar conduct by a co-worker. *Id.* According to the court, only the conduct of a supervisor can create employer liability under Title VII. *Id.* The court said:

> [A]n employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

*Id.* at 2443 (quoting *Burlington Industries, Inc., v. Ellerth*, 524 U.S. 742, 761 (1998)).

The allegations in the complaint show that plaintiff has satisfied her burden at this stage in litigation. Plaintiff indicates that Mr. Ford was originally her team leader and that he had the authority to "issu[e] discipline and conduct[] performance evaluations." (Compl. at 3.) Plaintiff further pleads, "the SSA promoted Ms. Klein to Mr. Ford's team leader position," and it appears from the face of the complaint that Ms. Klein's alleged harassment occurred during the time she held her new leadership position. Furthermore, defendant admits in a footnote that Mr. Klein was a "first-line supervisor" in an "interim capacity from October 2009 through May 2010," creating

an even stronger inference that Ms. Klein was a Title VII supervisor during some, if not all, of the complained of activity. (Motion, at 30, n. 19.) Of course, discovery may reveal that Ms. Klein did not have supervisory authority over plaintiff, but at this stage of litigation plaintiff need only plead facts raising a plausible inference that Ms. Klein had the authority effect a significant change in plaintiff's employment status. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). It is certainly a plausible inference that someone who has the authority to discipline employees and conduct performance evaluations also has the power to hire, fire, promote, reassign, or significantly change an employee's benefits within the meaning of *Vance*.

Defendant also argues that the decision to remove plaintiff from her position was signed by Ms. DeRegis and Ms. Horne, not by Ms. Klein, thereby countering the inference that Ms. Klein was a supervisor under Title VII. (Motion, at 29-30.) In making its argument, defendant relies on a document that appears to be a copy of the original Proposal to Remove used to terminate plaintiff's employment. Defendant is reminded that, in ruling on a motion to dismiss under Rule 12(b)(6), "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record." *U.S. ex rel. Spray v. CVS Caremark Corp.*, 913 F.Supp.2d 125, 141 (E.D.Pa. 2012) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). The document that defendant relies on is neither an allegation in the complaint, nor is it attached to the complaint as an exhibit. Furthermore, defendant does not argue that the Proposal is a matter of public record. As such, defendant's reliance on the Proposal for Removal is misplaced.

Even if the court was inclined to rely on documents extraneous to the complaint and its attached exhibits, it is a logical fallacy to find that Ms. Klein was not a supervisor under Title VII merely because she did not participate in supervisory conduct on one occasion. It is certainly possible that plaintiff was supervised by a number of employees, all of which had the authority to hire, fire, promote, reassign, or significantly change an employee's benefits within the meaning of *Vance*. As such, plaintiff has properly alleged vicarious liability at this stage.

## **CONCLUSION**

In light of the foregoing and, after construing defendant's motion as a motion to dismiss, the court finds that plaintiff has properly pleaded disparate treatment, hostile work environment, and retaliation claims under Title VII. Furthermore, the court finds that plaintiff has properly pleaded vicarious liability by alleging that a supervisor engaged in the purportedly unlawful conduct. As such, defendant's motion will be **DENIED** in its entirety.

BY THE COURT:

**C. Darnell Jones, II  J.**
**C. DARNELL JONES, II   J.**